**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT NASHVILLE**

**APRIL SESSION, 1999**

FILED

June 1, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9808-CC-00350** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **WILLIAMSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. DONALD P. HARRIS** |
| **HEATHER DENISE CURRY,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Judicial Diversion) |

**ON APPEAL FROM THE JUDGMENT OF THE
CIRCUIT COURT OF WILLIAMSON COUNTY**

FOR THE APPELLANT:

RICHARD McGEE
601 Woodland Street
Nashville, TN 37206

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

MARVIN E. CLEMENTS, JR.
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

JOE D. BAUGH, JR.
District Attorney General

LEE DRYER
DEREK SMITH
Assistant District Attorneys General
P.O. Box 937
Franklin, TN 37065-0937

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

On February 29, 1998, the Defendant, Heather Denise Curry, was indicted on charges of attempted theft and criminal impersonation. On April 6, 1998, she pleaded guilty to attempted theft, and as part of her negotiated plea agreement, the charge of criminal impersonation was "nolle prossed." The agreement called for the trial judge to determine her sentence, and the Defendant requested judicial diversion. On August 20, 1998, the trial court denied her request and sentenced her to two years' confinement, suspended, with four years on supervised probation. The Defendant now appeals her sentence, pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. The sole issue for our consideration on appeal is whether the trial court erred by denying the Defendant's request for judicial diversion. We affirm the judgment of the trial court.

At the sentencing hearing, the Defendant testified that on November 3, 1997, she and her then-boyfriend, Clarence Dickson, went to Walker Chevrolet in Franklin, Tennessee to purchase a vehicle. At the time, the Defendant was a twenty-year-old college student, and Dickson was thirty-three years old. She stated that Dickson told her that although his credit was not good enough for him to purchase a vehicle, a friend of his had offered to allow him to use her credit for the purchase. According to the Defendant, Dickson told her that his friend, Brand D. Sanders, had sent certain personal information to him, including a copy of her driver's license, her social security card, and a copy of her college diploma, for use in purchasing the vehicle. The Defendant claimed that she was told by Dickson that Sanders could not accompany him to the dealership because she

was out of town visiting her father, who was ill at the time. According to the Defendant, she understood that she had Sanders' permission to fill out and sign the credit application on Sanders' behalf.

The Defendant testified that while at the dealership, she told the salesman that her name was Brand D. Sanders and that she was a paralegal. She also supplied other false information from the packet of documents given to her by Dickson. However, she did provide the salesman with Dickson's correct phone number and address because "[h]e was supposed to be responsible for the payment of the vehicle." She maintained that Dickson used his real name during the meeting.

After the salesman filled out the application using the false information, the Defendant signed it as though she were Brand D. Sanders. She stated, "I was under the pretense that the information was correct, that Ms. Sander's [sic] information was correct and that I was not doing anything wrong because of the simple fact it was correct and I had her permission to use the credit." However, the Defendant also stated that during the application process, she was nervous.

At some point during the application process, the Defendant began to have second thoughts because of Dickson's "demeanor." She stated, "I just didn't feel like it was a safe situation for myself." Therefore, she approached the salesman and asked to terminate the process. He responded that he would do so after he finished his cigarette.

Shortly thereafter, the police arrived. The Defendant was arrested and transported to the police department. The Defendant denied ever representing herself as Ms. Sanders to police, claiming instead that she did not tell the police anything until she reached the police department. She also denied telling police that she did not have her wallet or purse at the time of her arrest. Dickson later posted the Defendant's bond. The Defendant claimed not to have had any personal contact with Dickson since that time, with the exception of seeing him once in court.

Detective Becky Johnson of the Franklin Police Department testified that she was called to Walker Chevrolet on the night of the offense. She stated that when she arrived, she approached the Defendant, who told her that her name was "Brandy Sanders." Johnson stated that when she asked the Defendant for identification, the Defendant responded that she had none, claiming that her purse and wallet were at home.

Johnson also reported that when she asked Dickson his name, Dickson replied that he was Joseph Young and supplied a driver's license with that name. However, Johnson "told him point blank that he was not the person in the picture on that driver's license." She explained, "[I]t was very obvious that he was not that person." Johnson testified that the officers soon found a collection of credit and business cards under the seat of Dickson's car, all of which were in the name of Clarence Dickson. It was later determined that Dickson had a prior criminal record.

According to Johnson, during an interview at the police department following the Defendant's arrest, the Defendant continued to claim that she was Ms. Sanders, while Dickson continued to claim he was Joseph Young. Eventually, after continued questioning, the Defendant admitted her real name to police and explained that she had gone to Walker Chevrolet to do a research project for school. Johnson testified that when asked about the identity of Dickson, the Defendant stated that "she didn't know who he was. She had met him, he told her his name was Joe. He had bought her some clothes, they had gone out but she didn't know what his name was." According to Johnson, the Defendant never explained to police, as she did in court, that she was using information provided by Ms. Sanders with Sanders' permission to help Dickson purchase a vehicle.

Detective Johnson also testified that she received a call from an employee at Walker Chevrolet on the day following the Defendant's arrest. She testified that the employee told her that the child of a customer had discovered the Defendant's purse in one of the artificial plants at the dealership. Inside the purse was photo identification of the Defendant with her real name.

Finally, Johnson testified that she saw the Defendant and Dickson together at the mall approximately two weeks prior to the sentencing hearing. She stated that when the Defendant noticed her, she "turned her head very quickly." She testified that she was unsure what time of day she saw the pair, but when pressed, she stated, "If I were going to have to guess I would say probably between 10:45 and 1:30 in the afternoon." In response to this testimony, the Defendant again took the stand and denied accompanying Dickson to the mall.

She produced payroll records from the "temp agency" where she worked, showing that on the day that Johnson claimed to have seen her in the mall, she worked from 8:00 a.m. until 5:00 p.m.

On appeal, the Defendant argues that the trial court erred by refusing to grant her judicial diversion. In her brief, she states,

> In sum, what you have in this case is a twenty-one (21) year old college student who was swept off her feet by an older, experienced "con." This young woman comes from a very strict family background and is the classic type of prey for a "con" such as Clarence Dickson. Ms. Curry not only successfully graduated college in four years, but did so well she was accepted to graduate school, while working an average of 37 hours a week and being responsible for the cost of her education. Counsel submits that this is exactly the kind of Defendant who should be sentenced pursuant to T.C.A. §40-35-313.

The sentencing option commonly known as judicial diversion is codified at Tennessee Code Annotated § 40-35-313. A defendant is eligible for judicial diversion if he or she (a) "is found guilty or pleads guilty to a misdemeanor which is punishable by imprisonment or a Class C, D or E felony," (b) "has not previously been convicted of a felony or a Class A misdemeanor," and (c) consents to the deferment of proceedings and placement on probation "for a period of time not less than the period of the maximum sentence for the misdemeanor with which the person is charged, or not more than the period of the maximum sentence of the felony with which the person is charged." Tenn. Code Ann. § 40-35-313(a)(1)(A).

> The fact that the accused meets these prerequisites does not entitle the accused to judicial diversion as a matter of right. The statute states that a trial court 'may' grant judicial diversion in appropriate cases. . . . Thus, whether the accused should be granted judicial

-6-

> diversion is a question which addresses itself to the sound discretion of the trial court.

State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993).

Tennessee courts have recognized the similarities between judicial diversion and pretrial diversion and, thus, have drawn heavily from the case law governing pretrial diversion to analyze cases involving judicial diversion. For instance, in determining whether to grant pretrial diversion, a district attorney general should consider the defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation, and amenability to correction; as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that pretrial diversion will serve the ends of justice and best interests of both the public and the defendant. See State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993).

A trial court should consider generally the same factors when deciding whether to grant judicial diversion. See Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572-73 (Tenn. Crim. App. 1992); State v. Hammersley, 650 S.W.2d 352, 355 (Tenn. 1983). In assessing a defendant's amenability to correction, a court may consider the defendant's truthfulness on the stand. State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994); see Anderson, 857 S.W.2d at 574. If, after assessing all relevant factors, the trial court chooses to deny judicial diversion, the court must articulate on the record both the specific reasons supporting the denial and why those factors applicable

-7-

to the denial of diversion outweigh other factors for consideration. See Bonestel, 871 S.W.2d at 168.

In reviewing the decision of a trial court to grant or deny judicial diversion, this Court applies "the same level of review as that which is applicable to a review of a district attorney general's action in denying pre-trial diversion." State v. George, 830 S.W.2d 79, 80 (Tenn. Crim. App. 1992); see also Bonestel, 871 S.W.2d at 168; Anderson, 857 S.W.2d at 572. In other words, this Court reviews the record to determine whether the trial court abused its discretion. See Bonestel, 871 S.W.2d at 168; Anderson, 857 S.W.2d at 572. To find an abuse of discretion, we must determine that no substantial evidence exists to support the ruling of the trial court. Id.

In the present case, the trial judge stated that he believed the Defendant "misrepresented the facts relating to the incident." Specifically, he stated that he believed she lied first by claiming she never told Detective Johnson that her purse and wallet were at home at the time of her arrest and second, when she testified that she never misrepresented Dickson's identity to police. His belief that she lied about these facts, he stated, also caused him to doubt the sincerity of her testimony refuting Detective Johnson's claim of seeing the Defendant and Dickson at the mall two weeks prior to sentencing. Therefore, he concluded, "I think she has failed to prove to this Court that she is an appropriate candidate for sentencing under 40-35-313. And there is a substantial likelihood that she is involved with persons who are involved in crime and that may continue." However, he also concluded that because the Defendant was in school at the time of the crime and at the time of sentencing, "requiring her to serve a sentence

-8-

may be more detrimental to society and the purposes of sentencing" and therefore elected to suspend her sentence.

We simply cannot conclude that the trial court abused its discretion by denying the Defendant judicial diversion. As this Court noted in Anderson,

> the record reflects that the trial court did not consider the defendant sincere in accepting responsibility for the offense and it was duly concerned with the defendant's attempt to divert the blame to another. These circumstances are relevant to assessing the degree of rehabilitation potential shown by the defendant. Since the trial court was in the best position to determine [the defendant's] attitude and demeanor, we are not in a position to view the defendant differently upon the record before us.

857 S.W.2d at 574. In this case, the trial judge stated that in determining the Defendant's sentence, he considered the presentence report, the testimony of witnesses at the sentencing hearing, the exhibits introduced at the hearing, arguments of counsel concerning alternative sentencing, mitigating and enhancement factors, and "the purposes and sentencing considerations that are set forth in our statute." The trial judge found that the Defendant misrepresented the facts during her testimony at her sentencing hearing causing him to disregard part of her testimony. Based on a thorough review of the record, we see no reason to overturn the trial court's decision.

Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE

_____
JAMES CURWOOD WITT, JR., JUDGE